[No. C057861. Third Dist. Sept. 29, 2009.]

In re the Marriage of NATALIJA and NIKOLAI SOLOMON LYUSTIGER.
NATALIJA LYUSTIGER, Respondent, v.
NIKOLAI SOLOMON LYUSTIGER, Appellant.

## COUNSEL

Akin Gump Strauss Hauer & Feld, Rex S. Heinke and Azra Hot for Appellant.

William D. Kopper for Respondent.

## OPINION

**NICHOLSON, J.**—In this action based on the former Uniform Foreign Money-Judgments Recognition Act (Act; Code Civ. Proc., former § 1713 et seq.), Natalija Lyustiger (Wife) seeks to enforce two orders of a British domestic relations court requiring Nikolai Solomon Lyustiger (Husband) to pay a total of 50,000 British pounds for Wife's attorney fees. After a trial in this enforcement action, the court determined that enforcement of the British orders was proper under the Act and entered judgment accordingly. We reverse. The Act specifically excludes from its scope the enforcement of "support in matrimonial or family matters," and it applies a broad definition of "support." (Code Civ. Proc., former § 1713.1, subd. (2).) The award of attorney fees was, for purposes of the Act, in the nature of "support"; therefore, the trial court erred by enforcing the award of attorney fees.

### UNIFORM FOREIGN MONEY-JUDGMENTS RECOGNITION ACT

Wife brought this action pursuant to the Act. (Code Civ. Proc., former § 1713 et seq. Further unspecified statutory references are to the Code of Civil Procedure.) Therefore, a summary of that law is in order.

In 1962, the National Conference of Commissioners on Uniform State Laws (NCCUSL) drafted the Uniform Foreign Money-Judgments Recognition

Act. The Act was adopted in California in 1967 as sections 1713 through 1713.8 of the Code of Civil Procedure. (Stats. 1967, ch. 503, § 1, pp. 1847–1848.)

The provisions of the Act most pertinent to this case were as follows:

A "foreign judgment is enforceable in the same manner as the judgment of a sister state . . . ." (Former § 1713.3.)

" 'Foreign judgment' means any judgment of a foreign state granting or denying recovery of a sum of money, other than . . . a judgment for support in matrimonial or family matters." (Former § 1713.1, subd. (2).)

The Act "applies to any foreign judgment that is final and conclusive . . . ." (Former § 1713.2.)

"A foreign judgment need not be recognized if [¶] . . . [¶] . . . [t]he judgment conflicts with another final and conclusive judgment . . . [or] [¶] . . . [t]he proceeding in the foreign court was contrary to an agreement between the parties under which the dispute in question was to be settled otherwise than by proceedings in that court . . . ." (Former § 1713.4, subd. (b)(4), (5).)

In 2005, the NCCUSL approved changes to the Act. In particular, the Act was amended to provide: "This [act] does not apply to a foreign-country judgment, even if the judgment grants or denies recovery of a sum of money, to the extent that the judgment is . . . [¶] . . . [¶] . . . a judgment for divorce, support, or maintenance, or other judgment rendered in connection with domestic relations." (NCCUSL, Uniform Foreign-Country Money Judgments Recognition Act (2005) § 3(b)(3).)

█ The 2005 amendments to the Act were enacted in California in 2007, with an effective date of January 1, 2008. (Stats. 2007, ch. 212, § 2.) The amendments apply only to actions initiated after the effective date. (§ 1724.) Therefore, this action, commenced in 2006, is subject to the 1962 Act and not to the amendments enacted in 2007.[1]

## FACTUAL AND PROCEDURAL BACKGROUND

### A. *Marriage and Separation*

Both Husband and Wife were born in Russia and lived there for some period of their young lives. Husband moved to the United States and gained

---

[1] The 1962 Act appeared in the Code of Civil Procedure at sections 1713 through 1713.8. Those sections were repealed, and the 2005 Act now appears in the Code of Civil Procedure at sections 1713 through 1724. (Stats. 2007, ch. 212, § 2.)

citizenship here, while Wife moved to Germany and became a German citizen. Wife later moved to London to study law.

Husband and Wife met in London in April 2001, and they were married in the United States in August 2002. Their daughter, Lillian Sarah Lyustiger, was born in Yolo County in September 2003.

After that, Husband and Wife lived, for a while, in Russia. Eventually, in February 2005, Wife, along with Lillian, returned to London where she trained with a law firm. Husband did not join her there.

### B.  *Facts Contained in Request for Judicial Notice and Related Evidence*

During the trial of this action, the trial court denied Husband's request for judicial notice of—or excluded as irrelevant—(1) a 2004 postnuptial agreement between Husband and Wife and (2) a 2005 Russian divorce, which preceded the British divorce proceedings.[2]

#### 1.  *Postnuptial Agreement*

In January 2004, the parties signed a postnuptial agreement. The agreement identified the parties' separate and community property. It provided for a payment from Husband to Wife of $10,000 for each full year of marriage before separation in exchange for Wife's waiver of any claim to Husband's property. Husband agreed to pay spousal support to Wife at a rate of $1,500 per month for the first 24 months after separation. Each party obtained representation and the advice of counsel before signing the postnuptial agreement, and each party agreed to pay his or her own attorney fees. In any action to interpret or enforce the agreement, the prevailing party would be entitled to recover reasonable attorney fees. The parties and their attorneys each agreed that the postnuptial agreement was not obtained by fraud or duress and was not unconscionable.[3]

#### 2.  *Russian Divorce Proceedings*

The request for judicial notice included, among other documents, several documents relating to Russian divorce proceedings, including (1) a power of

---

[2] By acknowledging and summarizing the contents of Husband's request for judicial notice, we do not endorse the validity of the documents. Because we conclude that the Act does not apply to the British orders here, we do not reach Husband's contention that the trial court erred by denying judicial notice of the postnuptial agreement and the Russian divorce.

[3] In the British proceedings, Wife asserted that she signed the postnuptial agreement under duress. The record does not reflect that this assertion has been adjudicated.

attorney signed by Wife, (2) a determination approving an "amicable agreement" between the parties, (3) a Russian decree of divorce dated May 23, 2005, and (4) an "amicable agreement" signed by Husband and by the person in whose favor Wife executed a power of attorney. The "amicable agreement" provided for Wife to have physical custody of Lillian and for Husband to pay support.

Husband proffered the testimony of Alexander Shvets, who would have testified that Wife went to Russia and that he gave Wife a check for $126,000 in a law office there on May 15, 2005. The money was from Husband, pursuant to the Russian divorce.

Husband also proffered testimony of the registrar of the London Beth Din, a rabbinical court, that a "get" had been issued and delivered to Wife establishing that, based on the Russian divorce, Husband and Wife were in fact divorced.[4]

### 3. *Trial Court's Ruling on Request for Judicial Notice and Related Evidence*

The trial court denied the request for judicial notice concerning the Russian divorce proceedings and refused to consider any evidence other than evidence relating to the British proceedings. The court reasoned, as follows: "The issues before the Court, as I understand them, are very narrow. The only issues to be addressed are three: first, has the United Kingdom order been authenticated? second, is it final and enforceable? third, can it be enforced as a monetary judgment in this jurisdiction? . . . [¶] . . . [T]o the extent any of the issues raised in those exceed these three topics, I won't allow them." The court denied Husband's request for judicial notice with respect to the Russian divorce and specifically prohibited references to or examination of witnesses concerning the Russian proceeding. The trial court's limitation of the issues to be decided also had the effect of rendering inadmissible the 2004 postnuptial agreement.

## C. *British Proceedings*

In August 2005, Wife filed a divorce petition in the High Court of Justice in London. Husband responded to the petition, stating that the court did not have jurisdiction because the marriage was already dissolved. The British

---

[4] In the British proceedings, Wife asserted that the Russian divorce was obtained by fraud. The record does not reflect that this assertion has been adjudicated.

court entered two orders requiring Husband to pay a total of 50,000 British pounds for Wife's attorney fees.[5]

Husband refused to pay the attorney fees, so the British court stayed proceedings until the sum is paid. Husband's request to appeal the award was denied.

Wife filed a petition in the British court alleging that Husband had abducted Lillian, the couple's daughter. The British court consolidated the divorce and child abduction proceedings and stayed them until Husband complies with the attorney fees order because Wife does not have the funds to go forward.

### D. *This Action to Enforce the British Orders*

In February 2006, Wife brought an action in the Yolo County Superior Court to enforce the British orders requiring Husband to pay 50,000 British pounds for Wife's attorney fees. A trial was held with the evidence consisting, mainly, of expert testimony concerning British law and the effect of the British proceedings. The trial court ruled that the British orders for attorney fees were enforceable under the Act and entered judgment requiring Husband to pay the United States dollar equivalent of 50,000 British pounds.

## DISCUSSION

### I

### *Applicability of the Act*

Husband contends that he is entitled to judgment in this foreign judgment enforcement proceeding because the Act does not apply to enforcement of these specific British orders. He asserts that this is a matter of "support" in the context of family law. Under the circumstances of this case, he is correct. Therefore, the Act, by its terms, does not apply and does not give the court authority to enforce the British orders.[6]

The two British orders for attorney fees were made as support for Wife. The text of the two maintenance orders, which provided for attorney fees as

---

[5] The British court also ordered Husband to make support payments to Wife "for her general maintenance." These support payments are not at issue in this action. The text of the British orders is discussed later in this opinion.

[6] Wife asserts that we must apply the substantial evidence standard of review because there was some dispute between the experts retained by the parties concerning the effect of the British orders. However, even adopting the interpretation of Wife's expert—that is, that the

well as other "maintenance," were prospective in form, not for payment of fees already earned. The first British order, made by the court on November 3, 2005, provided:

"The husband shall pay to the wife by 4pm on 10th November 2005 the sum of £27,500 by way of interim maintenance with effect from 28th October 2005 . . . to 6th December 2005, as to:

"i. £25,000 towards her legal fees, such monies to be held by her solicitors exclusively for the purpose of funding her legal fees and any balance as at 6th December 2005 is to be accounted for and will be subject to further order of the court;

"ii. £2,500 for her general maintenance."

The second order similarly provided for "interim maintenance" of £30,000 from December 7, 2005, to January 25, 2006, with £25,000 for "legal fees" during that period and £5,000 for "general maintenance."

There is no dispute that these orders were made pursuant to section 22 of the United Kingdom's Matrimonial Causes Act 1973. That section states: "On a petition for divorce, nullity of marriage or judicial separation, the court may make an order for maintenance pending suit, that is to say, an order requiring either party to the marriage to make to the other such periodical payments for his or her maintenance and for such term, being a term beginning not earlier than the date of the presentation of the petition and ending with the date of the determination of the suit, as the court thinks reasonable."

■ While this statute does not expressly provide for an award of attorney fees, British case law establishes that a court may make an award of attorney fees under this statute as a matter of maintenance of the spouse. In a British case, A v. A (Maintenance Pending Suit: Provision for Legal Fees) (2001) 1 FLR 377, the court concluded that the word "maintenance" could include attorney fees because attorney fees were a legitimate consideration in setting the amount of money the receiving spouse would need during the pendency of the marital dissolution proceeding. It therefore allowed for an award of attorney fees as part of the "maintenance pending suit" under section 22 of the Matrimonial Causes Act 1973.

From the language of the British statute, the application of the statute to attorney fees in A v. A, and the language of the order awarding attorney fees,

orders are enforceable in British courts by the same procedures as ordinary money judgments—the trial court's order is unsustainable as a matter of law. Therefore, we need not detail the differences in the testimony of the experts, and we do not apply the substantial evidence standard.

it is apparent that the British court awarded the attorney fees for Wife's maintenance, her support. There is nothing in the British legal system, as presented to us, that separately treats attorney fees and support. Instead, attorney fees are awarded as part of the support.

This broad interpretation of "support" in the British court is consistent with the NCCUSL's use of the word "support" in the Act.

In 2003, a report on the 1962 Act was prepared by the NCCUSL's Study Committee on Recognition of Foreign Judgments. The report noted that an "issue regarding the 'foreign judgment' exclusions arises from the phrase 'a judgment for *support* in matrimonial or family matters.' Is this phrase intended to exclude only judgments for support or does it also exclude other types of money judgments in connection with divorce and matrimonial and family matters, such as alimony? Courts tend to read the term 'support' beyond its literal meaning to broadly exclude all money judgments in connection with domestic matters, which was no doubt the drafters' intent. If the Act is amended, however, this exclusion should be rewritten." (Patchel, Study Report on Possible Amendment of the Uniform Foreign Money-Judgments Recognition Act (June 25, 2003) pp. 10–11, original italics, fns. omitted.)

The report's cited authority for the comment that "courts" tend to read "support" broadly is a case from Maryland, *Wolff v. Wolff* (1978) 40 Md.App. 168 [389 A.2d 413], in which the court interpreted the term "support" to include alimony payments. (*Id.*, 389 A.2d at p. 415.) The report also cited a law review article that stated that "[f]oreign support decrees have been the subject of several international efforts toward uniformity, all of which have treated them separately from money judgments. The widely divergent national laws relating to marital decrees of all kinds—as contrasted to other civil and commercial matters as to which there is a reasonable degree of similarity—are reason enough for separate treatment." (Kulzer, *Recognition of Foreign Country Judgments in New York: The Uniform Foreign Money-Judgments Recognition Act* (1968–1969) 18 Buff. L.Rev. 1, 13, fns. omitted; see also *Willmer v. Willmer* (2006) 144 Cal.App.4th 951 [51 Cal.Rptr.3d 10] [noting that Uniform Interstate Family Support Act (Fam. Code, § 4900 et seq.) authorizes enforcement of foreign judgment for child or spousal support in California].)

When the NCCUSL amended the Act in 2005, it stated: "The domestic relations exclusion has been redrafted to make it clear that all judgments in domestic relations matters are excluded from the Act, not just judgments 'for support' as provided in the 1962 Act. This is consistent with interpretation of the 1962 Act by the courts, which extended the 'support' exclusion in the 1962 Act beyond its literal wording to exclude other money

judgments in connection with domestic matters. *E.g.*, Wolff v. Wolff, 389 A.2d 413 ([Md.App.] 1978) ('support' includes alimony)." (NCCUSL, Uniform Foreign-Country Money Judgments Recognition Act (2005) com. No. 4, foll. § 3, p. 6; see *Manco Contracting Co. (W.L.L.) v. Bezdikian* (2008) 45 Cal.4th 192, 204 [85 Cal.Rptr.3d 233, 195 P.3d 604] [purpose of 2005 Act to clarify 1962 Act].)

This broad definition of "support" is not inconsistent with California law. Although attorney fees are a matter normally adjudicated separately from support (see Fam. Code, § 2030), the term "support" is broadly defined. (*In re Marriage of Benjamins* (1994) 26 Cal.App.4th 423, 429 [31 Cal.Rptr.2d 313].) In *Marriage of Benjamins*, the appellate court concluded that, because medical insurance premiums are "in the nature of spousal support" the duty of the supporting spouse to pay the supported spouse's medical insurance premiums terminates at the death of the supported spouse pursuant to the statute that provides that support obligations terminate at the death of the supported spouse. (*Id.* at p. 430; see Fam. Code, § 4337 [support obligation terminates with death of supported spouse].)

Concerning the terms "support" and "maintenance," the *Marriage of Benjamins* court stated:

" 'Support' is broadly defined as 'a source or means of living; subsistence, sustenance, or living. In a broad sense the term includes all such means of living as would enable one to live in the degree of comfort suitable and becoming to his station of life. It is said to include anything requisite to housing, feeding, clothing, *health*, proper recreation, vacation, traveling expense, or other proper cognate purposes; also, *proper care, nursing, and medical attendance in sickness*, and suitable burial at death.' (Black's Law Dict. (5th ed. 1979) p. 1291, col. 1, italics added.)

"The term 'maintenance' similarly involves expansive concepts of means to cover numerous types of living expenses, including health care: 'The furnishing by one person to another, for his support, of the means of living, or food, clothing, shelter, etc., particularly where the legal relation of the parties is such that one is bound to support the other, as between father and child, or husband and wife. . . . Term "maintenance" means primarily food, clothing and shelter, but it does include such items as reasonable and necessary transportation or automobile expenses, *medical and drug expenses*, utilities and household expenses.' (Black's Law Dict., *supra*, p. 859, col. 2, italics added.)

"Thus, 'support' and 'maintenance' are merely general terms used to describe a wide variety of various types of assistance designed to cover

everyday living expenses, including medical care." (*In re Marriage of Benjamins, supra*, 26 Cal.App.4th at p. 429; see also Fam. Code, § 150 [defining "support," circularly, as a "support obligation"].)

Just as medical expenses may become necessary when the spouse is ill or injured, legal expenses may become necessary when a spouse is involved in litigation to end a marriage. Although the *Marriage of Benjamins* and Black's Law Dictionary did not list attorney fees among the many expenses included in "support" or "maintenance," the spouse's payment of attorney fees detracts from that person's ability to cover other expenses. Thus, it is properly included in the broad definition of "support."

■ Because (1) "support" is a broadly defined term in California, (2) the NCCUSL intended that "support" in the Act be broadly defined to include all orders in domestic relations cases, and (3) the British order awarded attorney fees as part of Wife's "maintenance," which is essentially the same as "support" for the purpose of interpreting California law and the Act, we conclude that the award of attorney fees in the two British orders constituted "support" under the Act. Therefore, the trial court erred by enforcing the attorney fee orders under the Act, which does not apply to support orders. (Former § 1713.1, subd. (2).)

II

*Remaining Contentions*

Husband also contends on appeal that (1) the Act does not apply to the British orders because they were not final and conclusive (former § 1713.2); (2) the British orders conflicted with the Russian divorce and were therefore not enforceable (former § 1713.4, subd. (b)(4)); (3) the British orders conflict with the parties' postnuptial agreement (former § 1713.4, subd. (b)(5)); (4) the trial court denied Husband due process by restricting discovery and excluding evidence of the Russian divorce and the parties' postnuptial agreement; and (5) the trial court committed prejudicial error by repeatedly referring to the allegation that Husband had abducted the parties' daughter.

Having concluded that the Act does not apply to enforcement of the British orders because they are for support and that, consequently, the judgment must be reversed, we need not consider Husband's remaining contentions.

## DISPOSITION

The judgment is reversed. Husband is awarded his costs on appeal. (Cal. Rules of Court, rule 8.278(a)(2).)

Sims, Acting P. J., and Butz, J., concurred.